INA ROSE B. SNYDER V. FRANK M. SNYDER ET AL.

*Deed—Delivery—Destruction by grantor—Bill to restore—Burden of proof.*

Where a mother executes and delivers a deed to her daughter, and the daughter, at the mother's request, deposits the deed with the mother's attorney, to be placed upon record after her death, the mother desiring to keep the fact of the execution of the deed a secret from her other children, and upon their discovering such fact the attorney delivers the deed to the mother on her agreement to keep it for the daughter, the burden of proof is upon the remaining heirs to show an alleged compromise of the claim of the daughter to the land, and her consent to the destruction of the deed by the mother, which facts are held not to have been shown in this case.

Appeal from Oakland. (Moore, J.) Argued January 18, 1893. Decided March 10, 1893.

Bill to restore a deed which the grantor had destroyed. Defendants appeal. Decree affirmed. The facts are stated in the opinion.

*Baldwin, Draper & Jacokes,* for complainant, contended:

1. An allegation that $2,000 was paid for the land in controversy is sufficient to give the court jurisdiction; citing *Abbott v. Gregory,* 39 Mich. 68; *Glidden v. Norvell,* 44 Id. 202.
2. In support of the contention that the deed was delivered to complainant so as to pass the title to the land, counsel cited *Hosley v. Holmes,* 27 Mich. 416; *Ellis v. Secor,* 31 Id. 185; *Wallace v. Harris,* 32 Id. 380; *Latham v. Udell,* 38 Id. 240; *Schuffert v. Grote,* 88 Id. 650.

*Daniel L. Davis* and *Peter B. Bromley,* for defendants, contended:

1. If Sarah A. Snyder did not deliver the deed to complainant fully, so as to place the land beyond her control, the bill should be dismissed; citing *Allen v. Waldo,* 47 Mich. 516; *Devaney v. Koyne,* 54 Id. 116; *Waldo v. Waldo,* 52 Id. 92.
2. A grantee, by whose agreement a deed is destroyed, is estopped from giving parol evidence of its contents, and under the proofs in this case it would be dishonest in complainant to claim under the deed; citing *Gugins v. Van Gorder,* 10 Mich. 523; *Hayes v. Livingston,* 34 Id. 391; *Bank v. McAllister,* 46 Id. 402; *Crittenden v. Canfield,* 87 Id. 159.

McGRATH, J. This bill is filed to restore a deed executed by Sarah A. Snyder, the mother of the parties, in her lifetime, to the complainant.

The father died testate in 1865, leaving to his widow a life-estate in a valuable farm. The farm was sold in 1884, and the widow received as her portion the sum of $2,300. The widow lived upon the farm, after her husband's death, until the sale in 1884, with the exception of a short time at Rochester. After the farm was sold, she removed to Rochester, where she remained about two years, moving

from there to Oxford, where she lived until November, 1890, when she went to reside with her son, Frank M. Snyder, in the township of Oakland, remaining there until her death, which occurred March 13, 1891. All of the children except complainant married from the farm, and left it. Before the farm was sold, the mother and complainant went to Rochester to live, where complainant engaged in the millinery business. The mother went back to the farm for a short period, but, with the exception of this period, mother and daughter lived under the same roof from the death of the father, 1865, until November, 1890. After the sale of the farm, the mother went back to the daughter in Rochester. From there mother and daughter together went to Oxford, where the mother bought a lot, and erected a two-story brick building upon it, fitting up the lower part for her daughter's millinery establishment, and the upper story for their living apartments. Evidently the purchase of the lot and the erection of this building exhausted the mother's money, and left a mortgage upon the building, and some other outstanding accounts. In September, 1889, she received a back pension amounting to $2,500, by reason of injuries received by her son when in the service. From the time that the building was erected until the receipt of this pension, there appears to have been no income, except such as was derived from the millinery business. Whether the daughter paid off the mortgage and the other bills, and the mother refunded the amount out of the pension money, or the mother paid off these debts after the receipt of the pension money, does not clearly appear from the record, but it would seem that these debts were eventually paid from the pension money.

The mother's health began to fail in 1888, her trouble being cancer of the stomach, from which she died March 13, 1891.

The deed was executed January 16, 1889.    There is no dispute as to its execution.    On the evening of the 14th of January, during one of her severe spells, she requested her brother, who was one of her attending physicians, to write a letter to J. H. Holman, who resided at Rochester, and who had been her confidential adviser for some years, requesting him to come over and make out a deed of the Oxford property to her daughter.    Her brother suggested that she had better rest over night, and talk about it in the morning.    In the morning she again requested him to write to Holman, and he did so, saying in the letter that Mrs. Snyder wished him " to come up and make out a deed of this property to Rose."    On the 16th Holman came up and drew up the deed, and at her suggestion called in two neighbors to witness it.    After taking the acknowledgment,    Holman    delivered    the deed to Mrs. Snyder, who in turn delivered it to Rose.    Mrs. Snyder then explained to Rose that if the deed was put upon record the other children would learn of it, and suggested that she deliver it to Mr. Holman, to be put upon record after her death, and Rose did so deliver it.

Dr. Noble, a brother of the grantor, testified to the requests made by his sister, and his letter to Holman. He also says that he saw her again in about two weeks, and she told him that Holman had been there; that she had executed the deed, and delivered it to Rose, and that Rose had delivered it to Holman, to keep while she lived. Holman testifies that he came to Oxford upon receiving the letter; that she stated to him why she desired to execute the deed; that she desired nothing said about it, for, if the other children knew of it, they would dog her about it, and she did not want them to know of it. Mr. and Mrs. Purse (who were neighbors, were called in at the grantor's request, and who witnessed the execution of the deed) and Holman agree as to the execution of the deed,

and its delivery, and the conversation relating to it. Dr. Ide, who had rooms in this same house, and who was also her physician, says that Mrs. Snyder told him several times that she had executed a deed to Rose of that property, and explained to him why she had done so.

The other children afterwards learned of the execution of this deed. Mr. Holman then says that about a year after the execution of the deed, while making a call at the house, Mrs. Snyder asked him to bring her the deed, saying that the other children had found it out, and were hounding her about it, and if he would bring the deed to her she could tell them that Rose had no deed; that he explained to her that he could not let her have the deed unless Rose consented; that he saw Rose, but she objected; that at a subsequent time, when at the house, Mrs. Snyder seemed vexed because he had not brought the deed to her, and that he told her to get the consent of Rose, and she promised to do so; that afterwards Mrs. Snyder and one of her married daughters called at his office at Rochester, and wanted the deed, and he then promised her to come up and see if he could not satisfactorily arrange the matter; that he was going west to Washington to reside permanently, and did not want to have any trouble about the matter; that he then saw Rose, but she protested; that he then made a copy of the deed, and took with him John S. Stanton, and, in the presence of Stanton, Mrs. Snyder told Rose that she would keep the deed, "and said to me that she would keep the deed, and keep it just as good as I could keep it; and I delivered this deed to her under those circumstances. She promised to keep it for Rose." As to what occurred at this interview, Holman is corroborated by Mr. Stanton. The copy was produced at that time, and the papers were compared in the presence of Mrs. Snyder. This was in April, 1890. Mother and daughter continued to live together until November, 1890.

Rose seems to have been herself suffering from some physical complaint, and in the early part of November, 1890, she went to one of the hospitals at Detroit, to have an operation performed. In her absence the mother went to her son's house, and did not return, but died March 13, 1891, at the age of 72.

In February, 1891, complainant here filed a bill for the same relief which is here prayed. Defendant did not appear, and after her death that proceeding was discontinued, and this suit instituted.

On March 4, 1891, nine days before the mother's death, her testimony was taken upon notice, and it was introduced here. This testimony is wholly unreliable. She intimates that the execution of the deed was involuntary; that Holman took it, and carried it off; that her own brother was in the plot to secure the deed from her; that Rose had threatened her, and that she expected that Rose would kill her unless she executed the deed. But these statements are in direct conflict with what her own brother states; with what Dr. Ide, her own physician, says; with the testimony of Mr. and Mrs. Purse; and with that of Mr. Holman. When asked if Rose had said anything to her on the morning before the deed was executed about its execution, she says: "I don't think she had. I don't know but she did. I don't recollect." When asked if she ever told her brother to write to Holman, she says: "No, he had no right, no more than you had; not a bit." When asked how she came to make the deed, she says:

"I never heard a word about it, or thought of such a thing. She came to my bedside, and threatened me terribly. I cannot say what she said. I don't know whether she said anything about that or not, but I presume she did. It was Rose that came to my bedside.

"Q. What did Rose tell you about making a deed?

"A. She didn't tell me. My brother came upstairs where I was, and he told me that he had written to Hol-

man to come and make out a deed. I suppose it was all made up between them to scare me to do it.

"*Q*. How long before the deed was made did Rose first speak to you about making it?

"*A*. She really didn't speak about it. She just threatened me; and I suppose that is what she meant, but I couldn't remember.

"*Q*. State whether you delivered the deed to Rose.

"*A*. I never did. I never see it.

"*Q*. Did you tell Holman to take the deed, and put it on record after you died?

"*A*. No; I never told him a word. He took it, and I never see it until he fetched it back to me; and I bought her out in September."

Referring to the interview when the deed was delivered back to her, she was asked what Holman said to her at that time.

" *A*. I don't remember. He said that I ought to keep it there; that I hadn't ought to burn it up. That was there at that time. He stayed until night. He came into the room where I was after Mr. Stanton was gone, and talked with me until he got the $1,000. That was all there was in the bank. .

" *Q* Who did he say that he would have to pay the $1,000 to?

" *A*. He told me that I should give Rose that as security; that I should put it in the bank to stay; that Rose should take care of me. I never was bound to her.

" *Q*. Did Rose get that $1,000?

" *A*. I suppose Holman went and got it.

" *Q*. He got it for Rose?

" *A*. I suppose so.

" *Q*. State whether you took the deed from Mr. Holman to keep for Rose or to destroy it.

"*A*. I took it to destroy it when I took it. I bought it.

" *Q*. What did you pay her when you bought her out?

" *A*. $700; and I had paid two $100 notes, one of $175, and $300 on a mortgage; and she said, 'Mother, when you pay up those notes and pay up that mortgage, you can take up the deed.' I supposed it would be all straight, and the whole matter settled up.

" *Q*. State whether this $700 was in addition to the $1,000 that you paid.

"*A.* I took $1,000 out of the bank especially, and that was the $700.

"*Q.* State whether this $700 was a part of the $1,000 you let Holman have for Rose.

"*A.* No; it wasn't. I took the $1,000 out myself, and paid it. I had $2,500 in the bank. I have never had one cent of that $2,000,—interest or nothing.

"*Q.* Who has had that money?

"*A.* Mr. Holman. I was owing him $100 for overseeing the building, and he took $100 for getting a pension.

"*Q.* State whether Rose has had the balance of the $2,000 or not. Who had the balance?

"*A.* Holman took $200, and I had the furnace put in the cellar, and Rose took the balance, and had it to pay the debts on the building.

"*Q.* How came the debts on the building?

"*A.* We supposed it was all paid up, but they came afterwards,—different ones,—and pretended that he hadn't paid them. By 'he' I mean Holman.

"*Q.* Did Rose get any of this 1,000 that you say Holman drew from the bank, of your knowledge?

"*A.* Not that I know of.

"*Q.* Why did you give Holman this $1,000?

"*A.* Why, I gave it to him because he talked it out of me. He talked me most to death. He made me think I had to do it.

"*Q.* When Holman came to your house to make out the deed, who did you understand he was acting for?

"*A.* I expected he was acting for Rose. I wouldn't employ him anyway.

"*Q.* And when he came there and gave you up the deed, and you gave him the papers whereby he could draw $1,000 of your money out of the bank, who did you understand he was acting for then?

"*A.* For Rose.

"*Q.* State, if you know, who did go and get the $1,000.

"*A.* I don't know.

"*Q.* To whom did you understand that you were paying it to,—for whose benefit?

"*A.* It was to be put in as a stay. I never gave it to her. I calculated that she would have it if she would care for me.

"*Q.* State what Mr. Holman told you about your having to pay this $1,000 to Rose.

"*A.* Why, he said I should only put it in as a stay, and

that is all I put it in for. I calculated that I could do my own business, and that if I wanted to give her anything I could.

"Q. State whether you paid this $1,000 because Mr. Holman told .you that when you took up that deed you would have to pay Rose $1,000 as a stay to support you.

"A. As I should put that in as a stay that she should have something for taking care of me in my old age; but she hasn't done it.

"Q. Did Holman, when he came there to draw the deed, tell you that Rose had asked him to come?

"A. No; I don't know as he did. I don't remember. He told me my brother wrote him to come.

"Q. Do you know, of your own knowledge, that Rose received any of this $1,000 of the pension money?

"A. I don't know.

"Q. Do you know of your own knowledge that Holman drew any of this pension money?

"A. No; I don't.

"Q. Do you know of your own knowledge that it was to be used for the benefit of Rose?

"A. No; I don't."

This testimony is relied upon to sustain two theories: First, that the execution of the deed was an involuntary act; and, second, that there was a compromise, in the course of which the deed was surrendered.

A careful review of this testimony does not disturb the case made by complainant as to the execution of the deed, its delivery, its deposit with Holman, and its subsequent delivery by Holman to Mrs. Snyder, to be kept by her for complainant. These facts established, the burden of proof was upon defendants to show that complainant had, for a consideration, afterwards compromised her claim. There is no testimony tending to show that Rose, before the delivery of the deed to her mother or afterwards, intended to compromise for a consideration, or agreed to any settlement. Mrs. Snyder does say that Rose said to her, "When you pay up those notes and pay up that mortgage you can take up the deed;" but the deed was

not delivered to her in accordance with any such under-
standing. This appears from Mrs. Snyder's own testimony,
for she says that, when Holman delivered the deed to her,
he said she ought to keep it. Why so, if it was being
surrendered for a consideration? If she had bargained
with Rose for its surrender, why should Rose, who was
present, object, and why should not Mrs. Snyder have
silenced the objection? Why should Mrs. Snyder at that
interview say that she could keep it as well as Holman?
Mrs. Snyder does not pretend to say that she informed Rose
or Holman or Stanton that she intended to destroy the
deed, or that she had paid for it, or that it was hers. A
copy of the deed was retained by Holman, and this copy
was compared with the original in her presence. Holman
says that he did not learn of the destruction of the deed
till January, 1891. When asked if Holman knew that
she burned the deed, she says, " He didn't at the time, but
I told him after it."

Holman testifies that Mrs. Snyder, in January, 1891,
told him, in the presence of Mrs. Frank M. Snyder, that
she had destroyed the deed; that this was the first he had
heard of its destruction. That she did so inform him is not
denied. If the purpose of the delivery of the deed was its
surrender and destruction, or if by any subsequent arrange-
ment it was to be destroyed, why should Mr. Holman be
formally informed of the fact of its destruction? Accord-
ing to her story, Holman got the $1,000 before he knew
of the destruction of the deed, and before any intention
to destroy it was disclosed by her. She nowhere claims
that the $1,000 was paid to Holman because of the sur-
render and contemplated destruction of the deed. She
says, rather, that it was given to Holman so that Rose
should have something to take care of her in her old age.
The money which was paid to Holman was undoubtedly

the $700 which he refers to in his testimony as having been paid some days afterwards, and thinks went to Rose, but is not positive.

The mother remained with Rose about seven months after this transaction. There is no testimony that the relations between mother and daughter were strained until long after this time, and none that any feeling existed between Mrs. Snyder and Holman. Mrs. Snyder does say that she left Rose because Rose was ugly to her, but she dates this ill treatment back to the execution of the deed, and is contradicted by her own brother, by Dr. Ide, and others, who testify to the 'uniform care and kindness' of Rose to her mother both before and after this time.

It is evident from this record that the mother intended that Rose should have her property; that when she took this deed from Mr. Holman she did so for the reason given by her; and that she intended at that time to carry out her original intention. It is impossible to say just when she changed her mind, and it is unnecessary to speculate as to just how that change was brought about. We think the learned circuit judge, who heard the case below, arrived at the correct conclusion.

An application for a rehearing was made below, based upon affidavits setting forth a claim of newly-discovered evidence. The principal fact discovered is that on the 7th day of April a check upon a Detroit bank was drawn in favor of Joseph H. Holman for $700, signed by Sarah A. Snyder and Rose B. Snyder, upon which said Holman received the said sum of $700. The fact that Holman received this amount of money already appears in the record. He there admits its receipt, and thinks it went to Rose, but is not positive. It may be conceded that it did go to Rose, but it nowhere appears, if paid to her, that it was paid as a consideration for the destruction of this deed.

The decree must be affirmed, with costs of both courts to complainant.

The other Justices concurred.